# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| AT&T COMMUNICATIONS of ILLINOIS, INC., TCG ILLINOIS and TCG CHICAGO, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ILLINOIS BELL TELEPHONE COMPANY, INC. d/b/a SBC ILLINOIS and EDWARD C. HURLEY, ERIN M. O'CONNELL-DIAZ, LULA M. FORD, MARY FRANCES SQUIRES and KEVIN K. WRIGHT, in their official capacities as Commissioners of the Illinois Commerce Commission, )<br><br>Defendants. ) | No. 04 C 1768<br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, AT&T Communications of Illinois, Inc., TCG Illinois and TCG Chicago (collectively, "AT&T") have filed this suit against SBC Illinois ("SBC") and the Illinois Commerce Commission ("ICC")[1] pursuant to section 252 of the Telecommunications Act of 1996 seeking review of an ICC arbitration decision. For the reasons set forth below, the ICC's decision is affirmed in part and reversed in part.

---

[1] By suing the Commissioners in their official capacities, AT&T has actually sued the Commission itself, *see Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (stating that suit against a government officer in his official capacity constitutes suit against the entity that employs him), a suit that our court of appeals has held does not offend the Eleventh Amendment. *See MCI Telecommunications Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 348 (7th Cir. 2000) (holding that a state waives its Eleventh Amendment immunity by "exercising the power delegated to [it] by the [Telecommunications] Act" and, even if there were no waiver, suits pursuant to the Act would fall into the *Ex parte Young* exception to immunity).

## Background

Congress enacted the Telecommunications Act of 1996 to open up the local telephone service market to competition. Toward that end, the Act requires incumbent local exchange carriers ("ILECs"), like SBC, to share their networks with competing local exchange carriers ("CLECs"), like AT&T. 47 U.S.C. § 251(c)(2). The Act permits ILECs and CLECs to negotiate agreements that govern access to the networks. 47 U.S.C. § 252(a)(1). If the parties are unable to agree to the terms of an agreement, they may petition a state commission with jurisdiction over telecommunications issues to arbitrate their disputes. 47 U.S.C. § 252(b)(1). The state commission takes evidence and hears argument from the parties and rules on the issues. 47 U.S.C. § 252(b)(4). After the commission rules, the parties must submit the agreement, as revised by the arbitration, to the commission for approval. 47 U.S.C. § 252(e)(1). After the commission approves or rejects the agreement, either party may seek review in federal court. 47 U.S.C. § 252(e)(6).

AT&T and SBC followed this arbitration procedure with the ICC, but neither is wholly satisfied with the agreement that resulted. Thus, they have asked the Court to review the agreement and determine whether various of its provisions comply with the Act.

## Discussion

Whether the interconnection agreement approved by the ICC complies with the Act and its regulations is a question of law that is subject to *de novo* review. *Ind. Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 385 (7th Cir. 2004). Any factual determinations made by the ICC, however, will be set aside only if they are "arbitrary or capricious." *Id.* With these principles in mind, we turn to the parties' contentions.

2

AT&T challenges four of the provisions approved by the ICC: (1) the "bill and keep" (*i.e.*, no charge) arrangement for terminating internet service provider ("ISP")-bound foreign exchange ("FX") traffic (*i.e.*, long-distance traffic that uses a virtual local number so the party making the call is not charged a toll); (2) the bill and keep arrangement for terminating voice (*i.e.*, non-ISP bound) FX traffic; (3) the requirement that AT&T allow SBC to share, free of charge, the D-links, (*i.e.*, the facilities that AT&T and SBC use to connect their networks) that AT&T leases from SBC; and (4) the bill and keep arrangement for SS7 signaling (*i.e.*, the signaling information AT&T and SBC must exchange to complete telephone calls).

SBC challenges three of the ICC-approved provisions, which require that it: (1) provide AT&T with unbundled dedicated transport (*i.e.*, facilities used only by AT&T to transmit telecommunications between switches) between AT&T's switch and SBC's switch; (2) lease unbundled network elements to AT&T so AT&T can provide telecommunications services to itself and its affiliates; and (3) combine unbundled network elements for AT&T without regard to the limitations on combining obligations set forth by the United States Supreme Court.

## AT&T'S CHALLENGES

### ISP-Bound FX Traffic

The Act requires local telecommunications carriers to connect their networks so that customers of various carriers can call one another. 47 U.S.C. § 251(c)(2). But it does not require carriers to terminate, or complete, each other's calls free of charge. Rather, it envisions "reciprocal compensation" in which carriers pay each other a fee to terminate calls to their customers. 47 U.S.C. § 251(b)(5) (stating that each ILEC has "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications").

3

The assumption underlying reciprocal compensation is that local traffic between carriers is relatively balanced. *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report & Order, 11 F.C.C.R. 15,499 ¶ 1112 (1996) *("First Report")*. The popularity of the Internet however, cast serious doubt on that assumption. Unlike traditional voice traffic, ISP traffic is generally one-way; that is, ISPs receive a large volume of calls but place virtually none. *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Order on Remand, 16 F.C.C.R. 9151 ¶ 2 (2001) ("*Remand Order*"). Thus, a carrier whose customer is an ISP terminates a huge volume of calls that originate on other carriers' networks, and charges a termination fee each time, but because the ISP originates few, if any, calls, it generates virtually no termination fees for other carriers. *Id.*

In 2001, the FCC addressed this traffic imbalance in the *Remand Order*. First, the agency said that the ISP-bound traffic was not section 251(b) traffic, which is subject to reciprocal compensation, but fell within the exceptions enumerated in section 251(g) of the Act. *Id.* ¶ 1. Second, it concluded that a bill and keep payment system, in which carriers charge their customers, rather than one another, for terminating ISP-bound traffic, would be the fairest and most efficient compensation system for such traffic. *Id.* ¶ 4.

The FCC did not, however, mandate that a bill and keep system be immediately instituted for ISP-bound traffic. Rather, it adopted an interim system that would "limit, if not end, the opportunity for regulatory arbitrage, while avoiding a market-disruptive 'flash cut' to a pure bill and keep regime." *Id.* ¶ 77. That system set a series of intercarrier rate caps for ISP-bound traffic that declined over time from $.0015 per minute to $.0007 per minute. *Id.* ¶ 78. The rate caps, the FCC emphasized, applied only to intercarrier compensation that exceeded the caps:

> We also clarify that, because the rates set forth above are caps on intercarrier compensation, they have no effect to the extent that states have ordered LECs to exchange ISP-bound traffic either at rates below the caps we adopt here or on a bill and keep basis (or otherwise have not required payment of compensation for this traffic). The rate caps are designed to provide a transition toward bill and keep or such other cost recovery mechanism that the Commission may adopt to minimize uneconomic incentives, and no such transition is necessary for carriers already exchanging traffic at rates below the caps. Moreover, those state commissions have concluded that, at least in their states, LECs receive adequate compensation from their own end-users for the transport and termination of ISP-bound traffic and need not rely on intercarrier compensation.

*Id.* ¶ 80. But, the agency said, ILECs, like SBC, would not be permitted to "pick and choose" intercarrier compensation rates. *Id.* ¶ 89. Thus, "the rate caps for ISP-bound traffic . . . apply . . . only if an [ILEC] offers to exchange all traffic subject to section 251(b)(5) [*i.e.*, traffic subject to reciprocal compensation] at the same rate." *Id.*

In the arbitration before the ICC, AT&T argued that ISP-bound FX traffic is subject to the interim intercarrier compensation system set forth by the FCC in the *Remand Order*. (R. at C-03977-78, Arbitration Decision at 118-19.) The ICC disagreed. In its view, the *Remand Order* enabled it to retain the bill and keep arrangement for ISP-bound FX traffic that existed in Illinois. (*See id.* at C-03979, Arbitration Decision at 120.) AT&T says that conclusion is at odds with the *Remand Order* because: (1) it sets a rate different from the interim rate structure; and (2) violates the requirement that rates charged for ISP-bound traffic mirror those charged for traffic subject to reciprocal compensation.

The *Remand Order* does not require state commissions to adopt the interim rate structure. On the contrary, it explicitly says that the interim rate structure has "no effect" if "states have ordered LECs to exchange ISP-bound traffic either at rates below the caps . . . or on a bill and keep basis." *Remand Order* ¶ 80. The ICC has consistently subjected ISP-bound FX traffic to bill and keep, *see*

5

R. at C-03979, Arbitration Decision at 120 (listing decisions), an arrangement the *Remand Order* endorses.

The *Remand Order* does, however, require ILECs that exchange ISP-bound traffic on a bill and keep basis to exchange section 251(b)(5) traffic on that basis as well. *Remand Order* ¶ 89. Traffic subject to section 251(b)(5), the FCC said, is all telecommunications *except* "exchange access, information access, and exchange services for such access provided to IXCs [interexchange carriers] and information service providers." *Id.* ¶¶ 42, 46. Thus, the *Remand Order* requires ILECs to charge the same rate for local voice traffic, which is subject to section 251(b)(5), as they do for ISP-bound traffic, which is not.

SBC urges a different interpretation of this "mirroring" provision. In its view, the provision is not violated if like traffic is treated alike. Because the ICC subjects all FX traffic, ISP-bound or otherwise, to bill and keep, SBC says its decision is sound.

SBC's interpretation contradicts the plain language of the *Remand Order*. The *Order* does not direct state commissions to treat like traffic alike, but to treat different kinds of traffic alike. It explicitly states that ILECs must charge the same rate for ISP-bound traffic, which is excluded from 251(b)(5), as it does for traffic that is subject to that section. *Remand Order* ¶ 89. Thus, the issue is not whether SBC charges the same rate for both voice FX and ISP-bound FX traffic, but whether it charges the same rate for ISP-bound traffic, FX or otherwise, as it does for traffic that is subject to section 251(b)(5). The answer, according to the parties' interconnection agreement is no. (R. at C-00617, Interconnection Agreement, Pricing Schedule at 13 (setting price for terminating local calls at $.003746 per minute).) Because SBC charges AT&T to terminate voice traffic that is subject to section 251(b)(5), the ICC's adoption of a bill and keep system for ISP-bound FX traffic violates the mirroring provision of the *Remand Order*.

6

## Voice FX Traffic

In the arbitration, the ICC also decided that voice FX traffic would be governed by bill and keep. AT&T says that decision is erroneous because: (1) section 251(g) exempts certain traffic from reciprocal compensation, but only if that traffic was governed by other federal compensation rules before 1996; and (2) even if that section has a broader application, it still does not apply because voice FX traffic does not fall within any of its enumerated categories.

Section 251(g) provides:

On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996 and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

Because there were no federal compensation rules pertaining to voice FX traffic before 1996, AT&T says this section has no application.

The Court disagrees. Section 251(g) requires certain carriers to abide by compensation arrangements that existed prior to the Act until the FCC enacted new regulations pertaining to them. It does not, however, shield carriers who were not governed by pre-existing arrangements from the reach of any post-Act regulations. Among the regulations promulgated by the FCC after the Act is 47 C.F.R. § 51.701(a)(1), which exempts from reciprocal compensation all telecommunications traffic that is "interstate or intrastate exchange access, information access, or exchange services for

such access." Consequently, if voice FX traffic falls into any of those categories, it is exempt from reciprocal compensation, whether or not it was governed by a pre-1996 compensation arrangement.

The next question, of course, is whether voice FX traffic falls into any of those categories. The answer is no. No one suggests that voice FX traffic is information access. It is also not exchange access because AT&T does not charge its customers a separate fee for voice FX calls, a statutory prerequisite to exchange access. *See* 47 U.S.C. § 153(16) (defining exchange access as "offering of access to telephone exchange services . . . for the purpose of the origination or termination of telephone toll services" ); 47 U.S.C. § 153(48) (defining "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service"). Nor can voice FX traffic be exchange service because the statute assumes such service is provided for information or exchange access. *See* 47 U.S.C. §  251 (g) (requiring ILECs to "provide exchange access, information access, and *exchange services for such access* to interexchange carriers and information service providers in accordance with the same . . . interconnection restrictions and obligations" in effect before February 8, 1996) (emphasis added).

SBC and the ICC urge us to disregard the language of the statute and adopt the position taken by the ICC in *In re Level 3 Communications, Inc.*, I.C.C. No. 00-0332, 2000 WL 33424133, at *7 (I.C.C. Aug. 30, 2000): that FX traffic is not subject to reciprocal compensation because it "does not originate and terminate in the same local rate center," whether or not a toll charge is levied on it.

But the regulations governing reciprocal compensation have changed since the ICC decided *Level 3*. When that arbitration was decided, the regulations restricted reciprocal compensation to "local telecommunications traffic," which was defined as "[t]elecommunications traffic between [an ILEC] and [another] telecommunications carrier . . . that originates and terminates within a local

8

service area established by the state commission." 47 C.F.R. § 51.701(b)(1) (2000). Based on the regulation, the ICC concluded that FX traffic could not, as a matter of law, be subject to reciprocal compensation because such traffic travels between different local rate centers. *Level 3*, 2000 WL 33424133 at *7

After *Level 3*, however, the regulations were changed. They no longer restrict reciprocal compensation to "local" traffic. Rather, they now echo the statute and say that reciprocal compensation applies to all telecommunications traffic except that which is "interstate or intrastate exchange access, information access, or exchange services for such access." 47 C.F.R. § 51.701 (2004). As discussed above, those terms, as defined by the statute, do not encompass voice FX traffic. Thus, though it may be sound, as a matter of policy, to exclude voice FX from the reach of reciprocal compensation, the ICC cannot ignore the plain language of the statute to effect those policy goals. The ICC's determination that voice FX traffic is subject to bill and keep is, therefore, erroneous.[2]

**Sharing of D-links**

AT&T also challenges the ICC's requirement that it share its D-links with SBC, free of charge. D-links are facilities used to connect AT&T and SBC's SS7 networks, the networks that

---

[2]The parties do not contend that there is balance of voice FX traffic between the two carriers. Thus, we need not examine whether the exception to reciprocal compensation applies. *See First Report* ¶ 1111 ("As an additional option for reciprocal compensation arrangements for termination services, we conclude that state commissions may impose bill-and-keep arrangements if neither carrier has rebutted the presumption of symmetrical rates and if the volume of terminating traffic that originates on one network and terminates on another network is approximately equal to the volume of terminating traffic flowing in the opposite direction, and is expected to remain so . . . .").

transmit and receive the signaling information necessary to complete telephone calls. (*Id.* at C-03895-96, Arbitration Decision at 36-37.) AT&T leases the D-Links its uses from SBC.

Initially, those D-Links were used only by AT&T to receive the SS7 signaling information from SBC necessary to complete its customers' long-distance calls to SBC's local customers. But when AT&T entered the local telephone market, SBC started to use those links to receive SS7 signaling information from AT&T that it needed to complete its customers' calls to AT&T's local customers. AT&T believes that SBC's use of the D-Links makes them "shared facilities," for which SBC must help pay.

According to the FCC, a facility is shared if it is used "by multiple parties." *First Report* ¶ 741. The regulations require that the costs of shared facilities "be apportioned either through usage-sensitive charges or capacity-based flat-rated charges, if the state commission finds that such rates reasonably reflect the costs imposed by the various users." 47 C.F.R. § 51.507.

There is no dispute that SBC and AT&T both use the D-Links. (R. at C-03898, Arbitration Decision at 39.) But SBC says the shared facilities regulation does not apply because the D-Links are not new facilities developed for the exchange of section 251(b) traffic, the only facilities the regulation covers. In support of this argument, SBC cites paragraph 26 of the *First Report* and 47 C.F.R. §§ 51.1(b), 51.501(a). But none of those provisions restricts the shared facilities regulation to facilities developed in response to the Act. In fact, we were unable to find any provision in the Act or the regulations that contains such a restriction. Thus, the fact that the D-Links pre-date the Act has no bearing on the analysis.

The ICC makes a similar argument that is equally flawed. In the ICC's view, the shared facilities regulation does not apply because it, like all of the regulations in Part 51, pertains only to

10

local traffic. Because AT&T was using the D-Links for access, *i.e.*, long-distance, traffic before 1996, the ICC says that the regulations have no application.

The regulations do not, however, differentiate between facilities that have been, or are, used solely for local traffic and those that have been, or are, used for long-distance traffic as well. Rather, the regulations apply to any local traffic governed by section 251(b), which is one kind of traffic that all parties admit now travels the D-Links. Thus, the fact that the D-Links were once used only for long-distance traffic is not dispositive.

Even if the regulation could apply to the D-Links in theory, SBC says it cannot in this instance because AT&T's lease of the D-Links is governed by a pre-1996 tariff, by which both section 251(g) and the "filed rate" doctrine require it to abide. As noted above, section 251(g) requires ILECs to provide exchange access, information access, and exchange services for such access in accordance with pre-Act compensation schemes until those schemes are superseded by new FCC regulations. The "filed rate" doctrine forbids carriers to deviate from tariffs filed with regulatory agencies. *See AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998). AT&T's lease of the D-Links is governed by a pre-Act filed tariff, which sets the lease rate at $30,000.00 per month. (R. at C-03898, Arbitration Decision at 39.) Thus, SBC says, reducing the lease rate to account for its use of the D-Links would violate both the statute and the doctrine.

Requiring SBC to pay for its use of the D-Links will not, however, reduce the lease rate. The issue is not whether AT&T's lease obligation should be modified but whether a distinct usage obligation should be imposed on SBC. Because imposing such an obligation on SBC would have

11

no impact on AT&T's lease obligation, neither the Act nor the filed rate doctrine exempts SBC from the shared facilities regulation. The ICC's decision to the contrary was in error.[3]

**SS7 Signaling**

As noted above, the parties must exchange SS7 signaling information so they can complete calls made by their customers to the customers of the other company. The ICC adopted a bill and keep regime for the parties' exchange of SS7 signaling, a decision AT&T challenges.

The FCC permits state commissions to institute bill and keep arrangements for section 251(b) traffic "if neither carrier has rebutted the presumption of symmetrical rates and if the volume of terminating traffic that originates on one network and terminates on another network is approximately equal to the volume of terminating traffic flowing in the opposite direction, and is expected to remain so." *First Report* at ¶ 1111. In its arbitration decision, however, the ICC found that "[t]here is a traffic imbalance between SBC's and AT&T's networks; 80-85% of the traffic currently originates on SBC's network and terminates on AT&T's network." (R. at C-03898, Arbitration Decision at 39.) Thus, AT&T says, bill and keep is inappropriate.

AT&T's argument assumes that local traffic, which is subject to reciprocal compensation under section 251(b), and access traffic, which is not, are separable. If AT&T sent local and access messages to SBC over separate links, they would be. But that is not the arrangement AT&T has adopted. Rather, it has chosen to send SS7 signaling for both local and access traffic over the same

---

[3]The amount SBC will be required to pay is another matter. The regulation requires that "[t]he costs of shared facilities . . . be recovered in a manner that efficiently apportions costs among users." 47 C.F.R. § 51.507(c). It also says that "[c]osts of shared facilities may be apportioned either through usage-sensitive charges or capacity-based flat-rated charges, if the state commission finds that such rates reasonably reflect the costs imposed by the various users." *Id.* Thus, the ICC will have to determine the appropriate charge.

D-Links. (R. at C-04114, 10/30/03 ICC Clarifying Order.) That arrangement, the ICC found, and AT&T admits, makes it impossible to distinguish between local and access traffic. (*Id.* at C-04115.) Because AT&T cannot tell the two kinds of traffic apart, the ICC concluded that none of the SS7 signaling should be subject to reciprocal compensation. (*Id.*)

There is nothing suspect about that conclusion. The Act entitles AT&T to reciprocal compensation only for local traffic, yet AT&T has chosen to use a facilities configuration that prevents it from identifying that universe of traffic. That decision, the ICC reasonably concluded, caused AT&T to forfeit any reciprocal compensation to which it may otherwise have been entitled.

## SBC'S CHALLENGES

### Unbundled Dedicated Transport

FCC regulations require ILECs to "provide a requesting telecommunications carrier with nondiscriminatory access to dedicated transport on an unbundled basis." 47 C.F.R. § 51.319(e). "Dedicated transport" are facilities dedicated to a particular carrier for transmission of telecommunications between two switches. *See id.*; *First Report* ¶ 741. In the arbitration, AT&T argued that SBC was required to provide unbundled dedicated transport to AT&T on AT&T's side of the point at which AT&T's and SBC's networks interconnected. (R. at C-03882, Arbitration Decision at 23.) SBC contended that its was only required to provide dedicated transport between SBC's own switches. *(Id.)* Based on the FCC regulations in effect at the time, the ICC agreed with AT&T. *(Id.* at C-03883, Arbitration Decision at 24); *First Report* ¶ 440 (defining dedicated transport as "dedicated transmission facilities between LEC central offices or between such offices and those of competing carriers."). SBC says the regulations have since changed, invalidating the ICC's decision. *See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange*

*Carriers*, FCC Nos. 01-338, 18 F.C.C.R. 19,020 ¶ 366 ("*Triennial Review Order*") ("We find that a more reasonable and narrowly-tailored definition of the dedicated transport network elements includes only those transmission facilities within an [ILEC's] transport network, that is, the transmission facilities between [ILEC] switches.").

The ICC does not quarrel with the proposition that the Court must analyze the agreement in the light of the FCC regulations that currently exist. *See McCarty*, 362 F.3d at 388 (stating that regulations "in effect upon the rendering of [the] decision . . . must be applied in [the] case"). But it says we should not get to the point of analyzing this provision at all because the dispute is not properly before the Court.

According to the ICC, the "Changes in Law" provision of the agreement requires SBC to negotiate with AT&T concerning any legal change that impacts the agreement before seeking judicial intervention. In relevant part, that provision states:

> The Parties acknowledge that the respective rights and obligations of each party as set forth in this Agreement are based on the following, as they were on February 19, 2003: the Act, the Illinois Public Utilities Act . . . ("PUA"), the rules, regulations and orders promulgated under the Act and the PUA by the FCC and by the Commission, and judicial decisions by courts of competent jurisdiction interpreting and applying said statutes, rules, regulations and orders. In the event of any legally binding judicial decision by a court of competent jurisdiction, amendment of the Act or the PUA, or legislative, federal or state regulatory action, rule, regulation or other legal action that revises, reverses, modifies or clarifies the meaning of the Act, the PUA or any of said rules, regulations, orders, or judicial decisions that were the basis of the negotiations for this Agreement, or which otherwise affect any provisions set forth in the Agreement (individually and collectively a "Change in Law"), the Parties shall renegotiate the affected provisions in this Agreement in good faith and amend this Agreement to reflect such Change in Law.

(R. at C-00221-22, Proposed Interconnection Agreement (setting forth above language as that proposed by SBC for section 1.3); R. at C-03687, Arbitration Decision at 5 (stating that ICC adopted SBC's proposed language for section 1.3).) SBC does not claim to have negotiated with AT&T over

14

this issue. Until those negotiations happen, the ICC says, it is not clear that SBC will be injured by the dedicated transport provision in the agreement.

The Court agrees. Unless and until the contractually-mandated negotiations with AT&T - and any consequent petition to the ICC - fail, SBC's claim of injury is purely speculative. Because SBC has not, and may not ever, be injured by the dedicated transport provision, this claim is not ripe for adjudication. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581 (1985) (stating that claim is not ripe if it depends on "future events that may not occur as anticipated, or indeed may not occur at all") (internal quotation marks and citation omitted).

## Leasing of Unbundled Network Elements for AT&T's Own Use

The ICC rejected SBC's challenge to the provision of the agreement that requires it to provide unbundled network elements ("UNEs") to AT&T for its own use. SBC says that provision violates the Act, which only requires it to provide UNEs to AT&T for the provision of telecommunications services to the public. AT&T and the ICC defend the decision as a permissible exercise of the ICC's state-law power to take pro-competitive measures that are consistent with the Act. The Court agrees with AT&T and the ICC.

The Act requires ILECs to "provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis." 47 U.S.C. § 251(c)(3). The phrase "telecommunications services" is defined as "offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public." 47 U.S.C. § 153(46). The Act also says, however, that it does not prohibit "a State commission from establishing or enforcing other requirements of State law in its review of an agreement" or from enforcing or enacting regulations that are "not inconsistent

with the [Act]." 47 U.S.C. §§ 252(e)(3), 261(b). Thus, the Act requires SBC to: (1) give AT&T access to UNEs to provide service to the public; and (2) abide by any Illinois law that is not inconsistent with that obligation.

The Illinois Public Utilities Act ("PUA") permits any telecommunications carrier to use UNEs to "provide end to end telecommunications service . . . to its end users." 220 ILL. COMP. STAT. 5/13-801(d)(4). The PUA defines telecommunications service as:

> the provision or offering for rent, sale or lease, or in exchange for other value received, of the transmittal of information, by means of electromagnetic, including light, transmission with or without benefit of any closed transmission medium, including all instrumentalities, facilities, apparatus, and services (including the collection, storage, forwarding, switching, and delivery of such information) used to provide such transmission and also includes access and interconnection arrangements and services.

220 ILL. COMP. STAT. 5/13-203. It defines "end user" as "any person, corporation, partnership, firm, . . . or other entity provided with a telecommunications service for its own consumption and not for resale." 220 ILL. COMP. STAT. 5/13-217. Thus, state law permits AT&T to use UNEs to provide telecommunications service to itself and its affiliates. Because the Act does not require it to provide UNEs to AT&T for AT&T's own use, SBC says the state law requirement that it do so is inconsistent with the Act.

SBC made a similar argument to the Seventh Circuit in *Illinois Bell Telephone Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566 (7th Cir. 1999). In that case, SBC challenged an ICC-approved provision in its interconnection agreement with various CLECs that subjected ISP-bound traffic to reciprocal compensation. *Id.* at 569. SBC contended that the provision was inconsistent with the Act, a contention our court of appeals rejected:

> The ICC concluded that . . . reciprocal compensation is applicable to local traffic billable by Ameritech. . . . Ameritech attacks this conclusion primarily by stating that the Act does not require reciprocal compensation; the agreements precisely track the

Act (reciprocal compensation is "as described in the Act"); therefore the agreements cannot require reciprocal compensation for calls to ISPs. The syllogism is an oversimplification. That the Act does not *require* reciprocal compensation for calls to ISPs is not to say that it *prohibits* it.

*Id.* at 573 (emphasis in original). The same is true here. Though the Act does not require SBC to provide UNEs to AT&T for AT&T's own use, it also does not prohibit that arrangement.

Even if the Act does not explicitly prohibit the unbundling ordered by the ICC, SBC says that the challenged provision still cannot stand because it conflicts with the goals of the Act. SBC says that the overriding objective of the Act is to promote competition in the local telephone market. In SBC's view, allowing AT&T to purchase UNEs for its own use, rather than for providing local telecommunications service to the public, will not promote competition.

SBC's argument is premised on the notion that only actions that directly impact the consuming public are pro-competitive. It can be argued, however, that any measures that enhance a CLEC's ability to compete with an ILEC, like obtaining UNEs for their own use, fosters competition.[4] In any event, Congress and the FCC apparently do not share SBC's view that this practice is anti-competitive as neither the statute nor the regulations forbid it. In the absence of such a prohibition, we cannot allow SBC's interpretation of Congressional intent to trump that which is manifest in the statute itself. Thus, we hold that the ICC's decision to require SBC to provide UNEs to AT&T for AT&T's own use is not inconsistent with the Act.[5]

---

[4]There are, no doubt, other rejoinders AT&T could make to this argument if given the opportunity. Because SBC raised it for the first time in its reply brief, however, AT&T was unable to respond.

[5]Initially, SBC also argued that the ICC's decision conflicts with the FCC's mandate that CLECs use UNEs to provide "qualifying telecommunications services," which are those "'offered by requesting carriers in competition with telecommunications services that have been traditionally the exclusive or primary domain of [ILECs].'" (SBC's Br. Merits at 11 (quoting *Triennial Review Order* ¶ 141).) This argument, which is a non-starter in any event, *see U.S.*

## Combination of UNEs for AT&T

Section 251(c)(3) of the Act requires ILECs to provide UNEs "in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." The FCC interpreted that section as requiring an ILEC to:

> perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the [ILEC's] network, provided that such combination: (1) Is technically feasible; and (2) Would not undermine the ability of other carriers to obtain access to unbundled network elements or to interconnect with the [ILEC's] network.

47 C.F.R. § 51.315(c) ("the UNE combination regulations").

Subsequently, the Eighth Circuit invalidated those regulations. *See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 813 (8th Cir. 1997) ("We also believe that the FCC's rule requiring incumbent LECs, rather than the requesting carriers, to recombine network elements that are purchased by the requesting carriers on an unbundled basis, 47 C.F.R. § 51.315(c)-(f), cannot be squared with the terms of subsection 251(c)(3)."). The FCC appealed the Eighth Circuit's decision to the Supreme Court, which reversed. *See Verizon Comms. v. FCC*, 535 U.S. 467, 475 (2002) (reinstating the UNE combination regulations).

In the course of its opinion, however, the *Verizon* Court stated that those regulations have some restrictions. First, the Court said, the obligation to combine UNEs under the regulations arises only if "the [CLEC] is unable to do the job itself," "the requested combination does not discriminate against other carriers by impeding their access" and "the requested combination is 'technically feasible.'" *Id.* at 535 (quoting 47 U.S.C. § 251(c)(3)). Moreover, when the duty does arise, the ILEC

---

*Telecom Ass'n v. FCC*, 359 F.3d 554, 592 (D.C. Cir. 2004) (vacating qualifying/non-qualifying distinction), was withdrawn by SBC. (*See* SBC's Corrected Reply Br. at 22.)

must "'perform the functions necessary to combine,' not necessarily . . . complete the actual

combination," and the CLEC "must pay 'a reasonable cost-based fee' for whatever the [ILEC] does."

*Id.* (quoting 47 C.F.R. § 51.315(c)-(d)).

In light of *Verizon*, SBC proposed that the following language be included in the agreement:

SBC's UNE combining obligations referenced in this Section 9.3 apply only in situations where each of the following is met:

9.3.3.9.1      it is technically feasible, including that network reliability and security would not be impaired; *Verizon Comm. Inc. v. FCC*, 122 S.Ct. 1646, 1685 (May 13, 2002);

9.3.3.9.2      SBC-AMERITECH'S ability to retain responsibility for the management, control and performance of its network would not be impaired;

9.3.3.9.3      SBC-AMERITECH would not be placed at a disadvantage in operating its own network;

9.3.3.9.4.      it would not impair the ability of other Telecommunications Carriers to obtain access to UNEs or to interconnect with SBC-AMERITECH'S network. *Verizon Comm. Inc. v. FCC*, 122 S.Ct. 1646, 1685 (May 13, 2002); and

9.3.3.9.5 CLEC is

9.3.3.9.5.1      unable to make the combination itself; *Verizon Comm. Inc. v. FCC*, 122 S.Ct. 1646, 1685 (May 13, 2002); or

9.3.3.9.5.2      a new entrant and is unaware that it needs to combine certain UNEs to provide a telecommunications service (*Verizon Comm. Inc. v. FCC*, 122 S.Ct. 1646, 1685 (May 13, 2002)), but such obligation under this Section 3.9.3 ceases if SBC-13STATE informs CLEC of such need to combine.

(R. at C-01853-54, SBC's Initial Post-Trial Br. at 108-09.)

The ICC rejected this proposed language, and adopted that proposed by AT&T, which states:

Upon AT&T's request, SBC-Ameritech shall perform the functions necessary to combine SBC-Ameritech's Unbundled Network Elements in any manner, even if those elements are not ordinarily combined in SBC-Ameritech's network; provided that such combination is: (i) technically feasible, and (ii) would not impair the ability

of other Telecommunications Carriers to obtain access to Unbundled Network Elements or to Interconnect with SBC-Ameritech's network. In addition, upon a request of AT&T that is consistent with the above criteria, SBC-Ameritech shall perform the functions necessary to combine SBC-Ameritech's Unbundled Network Elements with elements possessed by AT&T in any technically feasible manner.

(R. at C-03921, Arbitration Decision at 62.) The ICC gave the following rationale for its decision:

The Commission has examined thoroughly those portions of the Supreme Court's ruling in *Verizon v. FCC*, 535 U.S. 467, 122 S.Ct. 1646 (2002) that concern FCC Rules 47 CFR Section 51.315(c) through (f). It is not disputed by any party that the Verizon decision upholds these rules. In doing so, the Supreme Court relied in part upon certain limitations on application of these rules as set forth in the FCC's Local Competition Order. We find that it would be appropriate to place into the agreement provisions from the Local Competition Order referenced by the Supreme Court's Verizon decision. Therefore, it would be unnecessary and inappropriate to place into the agreement any language from the Verizon decision itself.

(*Id.* at C-03920, Arbitration Decision at 61.) SBC contends that the ICC's decision violates the Act and the regulations as interpreted by the Supreme Court in *Verizon*.

The Court agrees. As the Seventh Circuit noted, the *Verizon* Court did not just reinstate the UNE combination regulations invalidated by the Eighth Circuit, it also "added an interpretive gloss" to them. *McCarty*, 362 F.3d at 390. That "gloss" consisted of the five restrictions outlined by the Court. *See Verizon*, 535 U.S. at 535. The language proposed by AT&T and adopted by the ICC states that SBC is required to perform the functions necessary for AT&T to combine UNEs if doing so is technically feasible and will not impede other carriers' access, three of the five *Verizon* restrictions. *See id.*; *McCarty*, 362 F.3d at 390. That language does not, however, make SBC's combination obligation contingent on AT&T's inability to combine UNEs itself or require AT&T to pay SBC "a reasonable cost-based fee" for any of SBC's combination efforts, the remaining two restrictions. Absent those provisions, the UNE combination provision in the parties' agreement violates federal law.

20

## Conclusion

For the foregoing reasons, the Court enters judgment declaring that the decisions of the ICC to: (1) subject ISP-bound FX traffic to bill and keep; (2) subject voice FX traffic to bill and keep; (3) require AT&T to share its D-Links, free of charge, with SBC; and (4) require SBC to combine UNEs for AT&T without regard to the *Verizon* restrictions violate federal law. The Court enjoins the parties from enforcing those provisions of the interconnection agreement and orders them to modify the agreement in accordance with this Memorandum Opinion and Order. The Court renders no decision on the issue of whether SBC must provide AT&T with unbundled dedicated transport between AT&T's switch and SBC Illinois' switch because that issue is not ripe for decision. In all other respects, the challenged decisions of the ICC are affirmed. This is a final and appealable order.

**SO ORDERED.**            **ENTERED:**

**HON. RONALD A. GUZMAN**
**United States District Judge**

March 25, 2005